JENSEN v CITY OF PONTIAC

Docket No. 53812. Submitted November 9, 1981, at Detroit.—Decided
February 17, 1982.

Jolynne Jensen brought an action against the City of Pontiac and
Wallace Holland, Mayor of the City of Pontiac, seeking a
declaration that the search procedures used on patrons enter-
ing the Pontiac Silverdome are unconstitutional. The searches
are conducted of containers large enough to conceal a bottle,
can, or other missile-like object and are entirely visual. Patrons
are asked for permission to search and, if permission is refused,
may be refused admittance. The Oakland Circuit Court, Steven
N. Andrews, J., found the search procedure to be constitutional
and ordered the city to adhere to specific guidelines regarding
the search procedure. The action against the mayor was dis-
missed. Plaintiff appeals, alleging that the search of her purse
was a violation of her right to privacy. *Held:*

1. The right to privacy is not absolute. Whether a search is
reasonable depends upon all the circumstances, including the
reasonable expectation of privacy of the person being searched.

2. The trial court found that the totality of the circumstances
indicated that patrons of the stadium consented to the
searches. The Court of Appeals declined to rest its decision on
the theory of consent.

3. The determination of constitutionality is based upon con-
sideration of three factors: (1) the public necessity, (2) the
efficacy of the search, and (3) the degree and nature of the
intrusion. In this case, the defendants showed that there was a
necessity for protection of patrons against injury inflicted by
objects thrown by unknown assailants. The procedure as modi-
fied by the trial court's order should be very effective in
stopping the flow of missile-like containers into the stadium.
Also, the search is rendered less offensive by the trial court's

REFERENCES FOR POINTS IN HEADNOTES
[1] 16A Am Jur 2d, Constitutional Law §§ 601, 602.
  62 Am Jur 2d, Privacy § 1 *et seq.*
  Right of privacy. 14 ALR2d 750.
[2] 68 Am Jur 2d, Searches and Seizures §§ 2, 4, 5.
[3-5] 68 Am Jur 2d, Searches and Seizures § 8 *et seq.*

order that all containers large enough to carry the unwanted objects are to be searched. Thus, the element of discretion on the part of the guards is removed and no stigma attaches to the person searched.

4. The factual findings of the trial court are not clearly erroneous.

Affirmed.

1. CONSTITUTIONAL LAW — RIGHT TO PRIVACY.

The right to privacy is not absolute; rather, a court must determine in each case what is a reasonable expectation of privacy under the circumstances.

2. SEARCHES AND SEIZURES — REASONABLENESS OF SEARCH — CONSTITUTIONAL LAW.

Only unreasonable searches and seizures are prohibited by the Fourth Amendment; whether a search is reasonable depends upon all the circumstances including the reasonable expectation of privacy of the person searched.

3. SEARCHES AND SEIZURES — PREADMISSION SEARCHES AT STADIUM — CONSTITUTIONAL LAW.

Three factors are to be considered in determining the constitutionality of warrantless, preadmission searches of patrons conducted at a stadium: (1) the public necessity for the search; (2) the efficacy of the search; and (3) the degree and nature of the intrusion.

4. SEARCHES AND SEIZURES — PUBLIC NECESSITY FOR SEARCH.

The matter of public necessity for a preadmission search procedure at a stadium can be evaluated by examining the nature of the threat to public safety involved and the likelihood that such a threat will materialize.

5. SEARCHES AND SEIZURES — EFFICACY OF SEARCH.

A court, in considering the efficacy of a preadmission search procedure at a stadium, should look to the likelihood that the search procedure will avert the potential harm for which the procedure is conducted.

Free Legal Aid Clinic (by *Robert Seibert*), for plaintiff.

*Wilson, Portnoy, Basso & Leader, P. C.* (by *Robert P. Roth*), for defendant.

Before: R. M. MAHER, P.J., and D. F. WALSH and D. C. RILEY, JJ.

D. C. RILEY, J. Plaintiff appeals by right, the refusal of the trial court to issue a declaratory judgment that the search procedures used on patrons entering the Pontiac Silverdome violate the Fourth Amendment of the United States Constitution.[1]

On December 9, 1979, the plaintiff attended a professional football game at the Silverdome. Before passing through the turnstile at the entrance to the stadium, plaintiff was stopped by an unknown uniformed stadium security guard. The guard asked plaintiff to open her purse, which she did, and he proceeded to visually inspect the contents of the purse. The parties agree that at no time did the guard physically touch the plaintiff or her property. The entire inspection lasted 15 to 20 seconds and no inspections of plaintiff's companions' purses were made.

For purposes of this lawsuit, the parties agree on the search method employed and its stated purpose. The search procedure was instituted in 1976 and is still in effect at all Silverdome events. The main purpose of the search procedure is to protect patrons and performers from injury due to thrown projectiles. A secondary purpose is to comply with the Michigan Liquor Control Commission rule that only alcoholic beverages bought on the premises may be consumed there.

The uniformed unarmed guards are stationed

---

[1] The requisite state action is established in this case because the City of Pontiac, a municipal corporation of the State of Michigan, owns the Pontiac Silverdome. The Pontiac City Commission sets and implements policy for the stadium. The Fourth Amendment guarantee against unreasonable searches and seizures is applicable to the states through the Fourteenth Amendment Due Process Clause. *Monroe v Pape,* 365 US 167; 81 S Ct 473; 5 L Ed 2d 492 (1961).

between the outside gates to the Silverdome and the inner turnstiles. Prior to entering the turnstile, a guard may stop any person carrying a container large enough to carry bottles, cans or other missile-like objects of similar size. There are no written criteria establishing a minimum size package that triggers the decision to stop patrons. The guards do not touch the patrons or their property at any time. If a container or package is involved, the patron may be asked to move things around within the container to enable the guard to visually inspect the contents.

The patron is first asked permission by the guard to visually inspect the package or container. The guard informs the patron that he may refuse to allow the guard to inspect. Patrons who refuse to allow the inspection may dispose of the container in a hearby waste can or return the container to their vehicle, after which admission will be allowed. Patrons who refuse to be searched or refuse to dispose of the container are refused admittance and may receive a refund of the ticket price.

At each gate into the Silverdome, there is posted a four-foot by four-foot bold letter sign stating:

"NOTICE: FOR YOUR PROTECTION BOTTLES, CANS, LIQUOR CONTAINERS, HORNS OR OTHER MISSILE-LIKE OBJECTS ARE NOT PERMITTED IN STADIUM. PLEASE RETURN SUCH ITEMS TO YOUR VEHICLE. PATRONS SUBJECT TO VISUAL INSPECTION OF PERSON, PARCELS, BAGS AND CONTAINERS OR CLOTHING CAPABLE OF CARRYING SUCH ITEMS. PATRONS MAY REFUSE INSPECTION. IF SO, MANAGEMENT MAY REFUSE ENTRY."

The plaintiff in this case is not bringing a class action nor contesting her treatment during the search procedure. The sole issue confronting the

trial court, and this Court, is the constitutionality of the procedure.

The trial court found the warrantless search procedure constitutional. The defendants demonstrated at the trial level that two exceptions to the warrant-prior-to-search requirement exist. Those exceptions are (1) the reasonable search exception such as those conducted at airports and courthouses and (2) searches based upon the consent of the person being searched. The trial court, in upholding the constitutionality of the procedure, ordered that the following be adhered to:

"1. The City of Pontiac shall instruct all stadium security guards to inspect the bag or purse of *every* patron which is large enough to conceal a bottle or can;

"2. The City of Pontiac shall also instruct all stadium security guards to request, not order, patrons to open their bags and simultaneously inform the patron that he or she may return the bag to their car should they not want it to be inspected;

"3. The City of Pontiac shall see that signs of identical size and content to the one cited in the text of this opinion are maintained at each gate at the Silverdome in an area easily visible to patrons prior to entering the turnstiles;

"4. The City of Pontiac shall continue to conduct the current visual search policy at the Silverdome in a manner not inconsistent with this opinion;

"5. Finally, the plaintiff's count against the defendant Holland is hereby dismissed, and this court retains jurisdiction over this matter as to defendant City of Pontiac to insure the visual search is conducted in a manner not inconsistent with this opinion."

Point one, in the opinion cited above, addresses the problem that the guards exercised too much discretion as to whom they would search. Point two above clarifies that it is the patron's right to refuse to submit to the search. Point three seeks to

maintain the procedure which informs patrons about the search procedure.[2]

This Court's analysis of defendant's procedures, as modified by the trial court's order, is a matter of first impression in Michigan. The plaintiff claims her right to privacy has been violated by the allegedly unconstitutional search. It is this right to privacy and not any "right" of a ticket holder to attend football games at the Silverdome that is arguably infringed upon. The right to privacy is not absolute. The Court must determine what is a reasonable expectation of privacy under the circumstances. See *South Dakota v Opperman,* 428 US 364, 367; 96 S Ct 3092; 49 L Ed 2d 1000 (1976). The Fourth Amendment prohibits only unreasonable searches and seizures. Whether the search is reasonable depends upon all the circumstances, *Coolidge v New Hampshire,* 403 US 443, 509; 91 S Ct 2022; 29 L Ed 2d 564 (1971), including the patron's reasonable expectation of privacy.

As a general rule, warrantless searches are unreasonable per se and violative of the Fourth Amendment "subject only to a few specifically established and well-delineated exceptions". *Katz v United States,* 389 US 347, 357; 88 S Ct 507; 19 L Ed 2d 576 (1967). The defendant maintains that two recognized exceptions are applicable to the instant facts: (1) express or implied consent and (2) administrative search procedures akin to warrantless courthouse, airport and inventory searches upheld on a reasonableness balancing test.

The trial court, in this case, found that the totality of the circumstances indicated that the patrons consented to the search. In *Schneckloth v*

---

[2] We believe it would be desirable to place notice of the search policy on the tickets. The failure to have the notice on the tickets is not fatal as we realize many patrons do not purchase tickets until minutes before entering the Silverdome.

*Bustamonte,* 412 US 218, 226; 93 S Ct 2041; 36 L Ed 2d 854 (1973), the Court held that the validity of the alleged consent depends upon the voluntariness with which it is given. The consent exception, when used in circumstances such as those present here, is of questionable constitutionality. We decline to rest our opinion on this theory, while noting that implied consent was the basis for upholding airport searches in *United States v Dalpiaz,* 494 F2d 374 (CA 6, 1974), and courthouse searches in *McMorris v Alioto,* 567 F2d 897 (CA 9, 1978). Other courts have refused to apply the consent exception in stadium search cases. *Gaioni v Folmar,* 460 F Supp 10, 14 (MD Ala, 1978), *Stroeber v Comm Veterans Auditorium,* 453 F Supp 926, 933 (SD Iowa, 1977), *Collier v Miller,* 414 F Supp 1357, 1366 (SD Tex, 1976).

We must now consider three factors which courts have relied upon in determining that warrantless searches in airports and courthouses are constitutional: (1) the public necessity, (2) the efficacy of the search and (3) the degree and nature of the intrusion involved. *E.g., United States v Edwards,* 498 F2d 496 (CA 2, 1974) (airport search), *Downing v Kunzig,* 454 F2d 1230 (CA 6, 1972) (courthouse search). These three factors have been applied by courts to determine the constitutionality of preadmission stadium search procedures.

In *Collier, supra,* the plaintiff brought a suit seeking declaratory relief under 42 USC 1983 for deprivation of rights secured by the Fourth and Fourteenth Amendments. The plaintiff challenged the preadmission stadium search procedure used at the University of Houston stadium. The plaintiff, when entering the stadium for a rock concert, was stopped by a security guard and her purse was physically taken away from her and searched.

Subsequently, she was arrested for disorderly conduct. There was no evidence that any signs were posted around the pavilion giving notice of the search policy or that bottles and cans were prohibited. The university's written policy prohibited alcoholic beverages and cans and bottles of any kind. The court found that the searches authorized by the policy included those of pockets large enough to hold bottles or cans. The policy also allowed the guards to physically touch the patrons and their property.

The *Collier* court applied the tripartite exception to the warrant requirement. The court found stadium cases distinguishable from airport cases where bombs or other weapons have no legitimate purpose on board airliners. Furthermore, in *Collier, supra,* 1362, "the defendants produced absolutely no evidence of any history of disturbances or injuries caused by thrown cans or bottles before and after implementation of the search policy". The court also had serious doubts as to the efficacy of the search. The degree and nature of the intrusion was found offensive because "the decision to search, as well as the degree of the ensuing search, are left entirely to the discretion of the searching guard". *Id.,* 1364.

Class actions challenging a preadmittance stadium search procedure were maintained in consolidated cases in *Wheaton v Hagan,* 435 F Supp 1134 (MD NC, 1977). Patrons were given notice of the search policy by use of signs posted at the door and printed on the back of the tickets. A public address announcement was sometimes used to inform patrons that alcohol, drugs and other contraband were expressly forbidden. The searches were conducted by fully armed and uniformed police officers. The patrons were visually and physically

searched. The guards' requests were taken by the patrons as commands and it was not a specific policy to inform the patron that he could refuse to be searched. The guards had made over 700 arrests in 3 years, at rock concerts, as a result of the search procedure. The court noted that festival seating was used at rock concerts and that this type of nonreserved seating created practical problems for a patron who wished to return a container to his automobile rather than be searched.

The court determined that the procedure could not be upheld on the basis of consent or by the stop-and-frisk exception to the warrant requirement. Further, the public necessity was not of such a magnitude as to justify the constitutionally questionable actions employed.

A rock concert search was once again challenged in *Stroeber, supra.* The challenged search procedure was in effect for rock concerts but not other stadium events. The guards, uniformed off-duty policy officers and two undercover off-duty officers, searched for controlled substances, alcoholic beverages, weapons or projectiles. The stadium posted signs warning of search policy and played a short amplified tape-recording, warning patrons of the same. No specific written policy guided the guards in their search, which could be visual or physical in nature. The testimony was conflicting as to whether the guards ordered or requested that the patrons submit to the search. Legal contraband was marked and could be reclaimed after the concert. The *Stroeber* court concluded, after citing *Collier* and *Wheaton,* that the procedure was unconstitutional.

In *Gaioni, supra,* the court considered a one-time search policy instituted for a rock concert. Police officials stated that they instituted the policy to

stem the illegal use of alcohol and marijuana at the concert. At the door to the concert, a general search of persons and their effects was conducted. Sixty to 70% of the entrants were searched for drugs and alcohol. Officers chose whom to search at their discretion. Although signs were posted, the court found that consent was coercive since people undoubtedly felt that if they refused to be searched they would forfeit their right to attend the concert. Persons were provided with no opportunity to object to the search. Considering the totality of circumstances presented, the court found the searches to be without consent and unreasonable.

The only state Supreme Court case involving a preadmittance stadium search procedure is *State v Carter,* 267 NW2d 385 (Iowa, 1978). In that case, the controlled substance found on the rock concert patron as a result of the search was used to bring criminal charges. The defendant challenged the constitutionality of the search and sought suppression of the evidence.

The stadium posted two signs in the lobby warning patrons that it was illegal to take controlled substances and alcohol inside. A 15-second taped message was continually aired which notified patrons of the stadium's policy. This tape stated, "you may be checked to see that these auditorium rules are complied with". The searches were both visual and physical in nature depending upon the discretion of the guard. The sole issue on appeal was whether the defendant had impliedly consented to the search. The court found that he had not and suppressed the evidence.

These five cases provide a standard by which to compare the facts of this case. Unlike *Collier,* in this case there is comparative evidence of distur-

bances both before and after installation of the search procedure. The defendant, in this case, presented testimony upon which the trial court concluded that there was a public necessity for preadmittance searches at professional football games.

Testimony regarding the public necessity was given by two doctors who, at various times, had each been the director of the Silverdome medical facility. We note, however, that their testimony, and statistics on injuries sustained, does not rise to the level of scientific or mathematical accuracy.[3] The trial court, after hearing the evidence presented, concluded that the "search policy was instituted in response to widespread injuries to patrons which occurred as a result of thrown objects". The seating arrangement at football games creates a unique problem in that objects thrown from seats above gain potentially fatal velocity and nearly always strike an unsuspecting patron in the head or shoulder region. The evidence reveals that football games tend to encourage violence in the stands and that this activity varies with the football team's performance.[4]

As the court stated in *Wheaton, supra,* 1145: "The matter of public necessity can be evaluated by examining the nature of the threat to public safety involved and the likelihood that such a threat will materialize." The nature of the threat is serious and the evidence bears out that it does materialize. The injury being protected against

[3] There is a lack of evidence of public necessity to search at events such as antique car shows, tractor pulls, and dog shows. The individual plaintiff in this case was attending a football game and not a rock concert; therefore, we do not address the constitutionality of preadmittance search procedures at rock concerts.

[4] The trial court incorrectly took judicial notice of recent events at Tiger Stadium where the safety of both players and patrons was placed in jeopardy by thrown objects.

occurs to individual patrons one at a time rather than the spectacular catastrophies possible in airplane bombings. However, the injury is still potentially fatal and always as unexpected. There is then a necessity, recognized by this Court and we believe the general public, to protect patrons at a public stadium from the harm inflicted by unknown assailants throwing container-type objects.

The second factor to be considered is the efficacy of the search. This consideration looks to the likelihood that the search procedure will avert the potential harm. *United States v Skipwith*, 482 F2d 1272, 1275 (CA 5, 1973). The trial court concluded that "[e]vidence on the record clearly shows that injuries caused by thrown objects have been substantially reduced since the implementation of the policy". The plaintiff does not deny a reduction in injuries reported but only that the reduction is not substantial. The modified procedure in this case requires every patron to be searched. The nondiscretionary procedure should be very effective in stopping the flow of missile-like containers into the Silverdome. The trial court was not required to find a defined threshold of effectiveness or public necessity. The court must establish the existence of public necessity and efficacy of the search and then these factors are to be balanced with the degree and nature of the intrusion involved.

The procedure involved here varies markedly from the other five reported stadium cases in the degree and nature of the intrusion involved. The Silverdome procedure requires the guards to inspect only visually the patrons and their property. Guards are specifically instructed not to place their hands in patrons' containers. The patrons may be asked to move items within their containers to facilitate complete visual inspections. In

*Collier, Wheaton, Stroeber, Gaioni* and *Carter,* the searches were visual and physical in nature. A physical pat-down search by a guard is more intrusive than a limited visual search.

The Silverdome guards are to request rather than order patrons to open containers so that they may be visually inspected. *Contra, Wheaton, supra, Stroeber, supra.* The patrons must be told that they do not have to submit to the search and that they may obtain a refund of their ticket price if they so desire. *Contra, Wheaton, supra, Gaioni, supra.* The avowed purpose in this case is primarily to protect the public and not the enforcement of drug or alcohol laws which would possibly require a less intrusive means. *Contra, Wheaton, supra, Gaioni, supra.* This purpose manifests itself in the Silverdome's use of uniformed security guards rather than armed or undercover police officers. See *Wheaton, supra, Stroeber, supra, Carter, supra.*

The modified procedure requires that all patrons be visually searched. The objectionable discretion element is thereby removed from this procedure. See *Collier, supra, Stroeber, supra, Gaioni, supra.* This search is less offensive to those searched because of the almost complete absence of any stigma attached to the searched person. See *Skipwith, supra,* 1275. "In addition, the offensiveness of the screening process is somewhat mitigated by the fact that the person to be searched must voluntarily come to and enter the search area." *Id.,* 1275-1276.

Upon balancing the public necessity, efficiency of the search and intrusiveness of the search, we conclude that the modified procedure is constitutional as applied to professional football games. This Court will not reverse a trial court's factual

findings in a declaratory action unless they are "clearly erroneous". *Lenawee County Board of Comm'rs v Abraham,* 93 Mich App 774, 779; 287 NW2d 371 (1979). The trial court found the evidence supported a finding that public necessity existed and that the procedure was effective. This finding was not clearly erroneous.

The limited scope of this search procedure and its implementation due to a real threat to the public safety and welfare weigh heavily in its favor.[5] See *Chenkin v Bellevue Hospital Center,* 479 F Supp 207 (SD NY, 1979). Finally, we note that the trial court has retained jurisdiction in this matter over defendant City of Pontiac to insure that the visual search is conducted in a manner consistent with the trial court's opinion.

Affirmed.

---

[5] This case is distinguishable from other preadmittance stadium search cases cited within this opinion in that the main purpose of the search is related to public safety. The requisite public necessity to justify this degree of intrusion for enforcement of drug or alcohol laws is not present in this case.