2005 ND 124

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Scott N. SEGLEN, Defendant and Appellant.**

**No. 20040094.**

Supreme Court of North Dakota.

July 13, 2005.

David T. Jones (argued), Assistant State's Attorney, Thomas H. Falck, Jr. (on brief), Assistant State's Attorney, and Kelly D. Crammer (appeared), appearing under the Rule on the Limited Practice of Law by Law Students, Grand Forks, ND, for plaintiff and appellee.

Larry J. Richards, Grand Forks, ND, for defendant and appellant.

KAPSNER, Justice.

[¶ 1] Scott Seglen appealed a criminal judgment based on his conditional guilty plea entered after the district court's denial of his motion to suppress evidence in his minor-in-possession case. He argues the evidence was obtained during an unconstitutional search and seizure. We find the pat-down search by a University of North Dakota police officer was unconstitutional. We reverse and remand to allow Seglen an opportunity to withdraw his guilty plea.

I.

[¶ 2] Seglen, a 20–year–old University of North Dakota student, attended a college hockey game at Ralph Engelstad Arena ("REA") in Grand Forks on November 8, 2003. The game was between the University of North Dakota and the University of Minnesota, and the governors of both states were in attendance. The privately owned and operated arena had extra security measures in place because the games between these rivals are historically sold-out and highly competitive. University of North Dakota police officers were placed inside the student entrance and students were subjected to pat-down searches. Signs inside the arena warned patrons they were subject to search. Arena officials asked the officers to pay special attention to entrants wearing bulky jackets because REA officials had determined bulky jackets were a primary means for bringing unauthorized items into the arena. There have been incidents of animal carcasses being thrown onto the ice at these games, but there is no record of injury to players, officials, or spectators. Likewise, there is no record of any other violence by, or injury to, spectators.

[¶ 3] Officer Inocencio, a member of the University of North Dakota Police Department, observed and physically searched Seglen as he entered the arena. Inocencio saw and felt a "bulge" in Seglen's jacket and asked him to remove the item creating the bulge. Seglen removed a can of Coors Light from his jacket. Inocencio determined Seglen's age and identity, at which point Seglen produced a second can of Coors Light. Seglen was cited with Minor in Possession of an Alcoholic Beverage and asked to leave the premises.

[¶ 4] Seglen filed a motion to suppress the evidence at his minor-in-possession trial, arguing the search and seizure were unreasonable under Fourth Amendment standards. The district court denied the motion, finding the security measures taken by the arena that evening were reasonable because the game was between the University of North Dakota and the University of Minnesota, the governors of both states were present, signs inside the arena warned entrants they were subject to

search, and similar pat-down searches were conducted on all persons wearing bulky jackets who entered through that particular gate. Seglen entered a conditional guilty plea, reserving his right to appeal the denial of his suppression motion.

## II.

[¶ 5] The following standard of review is applied when a district court decides a motion to suppress:

> We will defer to a trial court's findings of fact in the disposition of a motion to suppress. Conflicts in testimony will be resolved in favor of affirmance, as we recognize the trial court is in a superior position to assess credibility of witnesses and weigh the evidence. Generally, a trial court's decision to deny a motion to suppress will not be reversed if there is sufficient competent evidence capable of supporting the trial court's findings, and if its decision is not contrary to the manifest weight of the evidence.

*State v. Heitzmann*, 2001 ND 136, ¶ 8, 632 N.W.2d 1 (quoting *State v. Wanzek*, 1999 ND 163, ¶ 5, 598 N.W.2d 811). Questions of law are fully reviewable. *Heitzmann*, at ¶ 8.

[¶ 6] Unreasonable searches and seizures are prohibited by the Fourth Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment, and by Article I, § 8 of the North Dakota Constitution. *Wanzek*, 1999 ND 163, ¶ 7, 598 N.W.2d 811. The Fourth Amendment only applies to government action; "a wrongful search or seizure conducted by a private party does not violate the Fourth Amendment." *Walter v. U.S.*, 447 U.S. 649, 656, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980); *see also State v. Ronngren*, 361 N.W.2d 224, 228 (N.D. 1985); *State v. Rode*, 456 N.W.2d 769, 770 (N.D.1990). Inocencio was acting in his

capacity as a University of North Dakota police officer, so the Fourth Amendment applies even though REA is privately owned and operated.

[¶ 7] "Warrantless searches are unreasonable unless they fall within a recognized exception to the requirement for a search warrant." *Wanzek*, 1999 ND 163, ¶ 7, 598 N.W.2d 811. When the State alleges a warrantless search falls within an exception, the State bears the burden of proving the purported exception applies. *State v. Mitzel*, 2004 ND 157, ¶ 12, 685 N.W.2d 120. Recognized exceptions include: consensual searches, stop and frisk searches, hot pursuit, border searches, and airport and courthouse searches. *Jacobsen v. City of Seattle*, 98 Wash.2d 668, 658 P.2d 653, 655 (1983) (citations omitted). The State argued the search of Seglen at REA could be classified as a stop and frisk search, an airport/courthouse-type search, or a consensual search.

### A.

[¶ 8] The United States Supreme Court established the "stop and frisk" exception in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The *Terry* case involved a police officer who conducted a pat-down search of two men he suspected were planning an armed robbery of a store. *Id.* at 5–8, 88 S.Ct. 1868. He testified the search was conducted because he had a reasonable suspicion the men were armed and an imminent fear for his own safety and the safety of those around him. *Id.* at 8, 88 S.Ct. 1868. The Court found the search was not a violation of Terry's Fourth Amendment rights, but urged that its holding be narrowly applied:

> We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the per-

sons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.* at 30, 88 S.Ct. 1868. The Court further stated "in determining whether the seizure and search were 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 19–20, 88 S.Ct. 1868.

[¶ 9] Inocencio testified he did not believe Seglen was hiding a weapon, and the object spotted in Seglen's coat "appeared to be some sort of beverage container." Under the *Terry* exception, "a law enforcement officer may conduct a frisk, or a pat-down search, of a person only when the officer 'possesses an articulable suspicion that an individual is armed and dangerous.'" *Heitzmann*, 2001 ND 136, ¶ 11, 632 N.W.2d 1 (quoting *State v. Haverluk*, 2000 ND 178, ¶ 22, 617 N.W.2d 652). Because Inocencio admitted he did not believe Seglen was armed, the search does not fall within the *Terry* exception.

### B.

[¶ 10] Limited searches of persons entering airports and courthouses have been found constitutional in light of "unprecedented airport bombings, aircraft piracy and courtroom violence." *Collier v. Miller*, 414 F.Supp. 1357, 1362 (S.D.Tex.

1976). The State argues the security needs at large arenas and sporting events are similar to airports and courthouses, especially in recent years. Other courts have rejected this argument when asked to extend the warrant exception to rock concerts. *See generally Jacobsen*, 98 Wash.2d 668, 658 P.2d 653; *Collier*, 414 F.Supp. 1357.

[¶ 11] The *Jacobsen* case involved pat-down searches as patrons entered a rock concert. The Seattle Police Department conducted the searches and confiscated unmarked heart medicine, removed an unopened pack of cigarettes from a purse, opened the pack and inspected the individual cigarettes. *Jacobsen*, 658 P.2d at 654. Patrons were unaware they were subject to search prior to entering the concert. *Id.* The court found "highly intensive pat-down searches by police officers" to be "unconstitutional." *Id.* at 656. The court refused to analogize the rock concert searches to airport and courthouse searches and found they are not exempt from constitutional protection. *Id.*

[¶ 12] In *Collier*, the plaintiff's purse was seized and searched by an on-duty officer of the University of Houston's Traffic and Security Department upon entering a rock concert in Houston, Texas. *Collier*, 414 F.Supp. at 1359. Her three companions were not searched. *Id.* at 1360. The purported purpose of the search was to prevent "alcoholic beverages, bottles, grass and weapons" from entering the facility. *Id.* There were no signs informing patrons of the search policy. *Id.* at 1366. The court expressed concern because the decision of whom to search, and the degree of the search, was left entirely to the officer's discretion. *Id.* at 1364. The court found the searches were conducted "without any definitive basis for suspicion" and "constitute[d] serious intrusions which can be both annoying and humiliating." *Id.* at

1365. The court further stated, "[t]his Court does not read *Terry v. Ohio* to sanction wholesale searches of the general public in the absence of exigent circumstances, regardless of the searching official's valid interest in preventing potential injuries." *Id.*

[¶ 13] With the exception of the presence of signs, the *Jacobsen* and *Collier* cases are factually similar to Seglen's. Both courts found rock concerts did not require the same level of security as airports and courthouses.

[¶ 14] The State argues the country has a greater need for security now than when the cases were decided in 1983 and 1976, respectively, and the presence of the governors only increased that need. The Eleventh Circuit rejected this argument in a case involving protestors at a United States military school at Fort Benning, Georgia. *Bourgeois v. Peters,* 387 F.3d 1303 (11th Cir.2004). Approximately 15,-000 people gather annually to protest the United States government's funding of the school where military leaders from other Western Hemisphere countries are trained. *Id.* at 1306. No weapons have been found at the protest site and no protestors have been arrested for acts of violence during the protests' thirteen-year history. *Id.* The city where the school is located instituted a policy in 2002 requiring all protestors to submit to a magnetometer search, providing as reasons: the Department of Homeland Security threat level was "elevated"; protestors had "demonstrated a history of 'lawlessness'" by engaging in "frenzied dancing," lingering after the conclusion of the scheduled protest, and "'form[ing] a "global village" from large debris'"; some protestors in past years had ignited smoke bombs and entered Fort Benning to peacefully march on the school; and several "affinity groups" who had allegedly instigated vio-

lence at other, unrelated protests had been invited. *Id.* at 1307.

[¶ 15] The Eleventh Circuit declared the searches unconstitutional, finding "[w]hile the threat of terrorism is omnipresent, we cannot use it as the basis for restricting the scope of the Fourth Amendment's protections in any large gathering of people .... the Fourth Amendment embodies a value judgment by the Framers that prevents us from gradually trading ever-increasing amounts of freedom and privacy for additional security.... September 11, 2001, already a day of immeasurable tragedy, cannot be the day liberty perished in this country." *Id.* at 1311–12.

[¶ 16] We agree with our colleagues in the Eleventh Circuit. There was no history of injury or violence presented in this case and nothing in the record supports a suspicion-less search of all patrons by a University of North Dakota police officer.

## C.

[¶ 17] The State argues Seglen consented to the search because signs are posted inside the arena notifying patrons they will be "Subject to Search" "For [Their] Safety." Consent is a recognized exception to the warrant requirement. *Mitzel,* 2004 ND 157, ¶ 13, 685 N.W.2d 120; *see also State v. Guthmiller,* 2004 ND 100, ¶ 5, 680 N.W.2d 235.

The trial court needs to determine whether the consent was voluntary under the totality of the circumstances. To be voluntary, the consent must not be coerced by explicit or implicit means or by implied threat or covert force. Although the existence or absence of certain factors concerning the characteristics and condition of the person at the time of consent and the details of the setting in which the consent was obtained are significant in deciding volun-

tariness, no one factor in and of itself is determinative.

*State v. DeCoteau,* 1999 ND 77, ¶ 9, 592 N.W.2d 579 (quoting *State v. Avila,* 1997 ND 142, ¶ 16, 566 N.W.2d 410) (internal citations omitted).

[¶ 18] The State must show "affirmative conduct by the person alleged to have consented that is consistent with the giving of consent, rather than merely showing that the person took no affirmative actions" to prevent the search. *Avila,* 1997 ND 142, ¶ 17, 566 N.W.2d 410 (citing *U.S. v. Jaras,* 86 F.3d 383, 390 (5th Cir. 1996) (consent cannot be inferred from silence and failure to object when police do not expressly or implicitly request consent); *Ingram v. State,* 364 So.2d 821, 822 (Fla.Ct.App.1978) (submission to apparent authority of officer is not necessarily consent to search, and a showing of acquiescence without at least tacit consent is not sufficient to prove consent) (citations omitted)).

[¶ 19] The trial court noted signs were "conspicuously posted" at REA entry points warning persons entering REA that they are "subject to search." The existence of conspicuously posted signs does not establish Seglen's consent to a search. There is no evidence of affirmative conduct by Seglen to consent to the search. The State did not meet its burden of establishing Seglen's consent; therefore, the consent exception to the warrant requirement is not applicable.

## III.

[¶ 20] The State urges consideration of a Michigan case that upheld searches of fans entering a sporting event. *Jensen v. City of Pontiac,* 113 Mich.App. 341, 317 N.W.2d 619 (1982). The *Jensen* plaintiff was entering the stadium to attend a professional football game when a security officer asked her to open her purse so he could look inside. *Id.* at 620. The officer did not touch her or her property. *Id.* Large signs warned patrons they may be subject to search and stated they could refuse inspection and risk being refused entry. *Id.* The plaintiff challenged the constitutionality of the procedure. *Id.*

[¶ 21] The *Jensen* court found the procedure used was minimally invasive because only visual searches were conducted. *Id.* at 620–21. The court stated, in dicta, "[a] physical pat-down search by a guard is more intrusive than a limited visual search." *Id.* at 624. The court further ordered: patrons are to be asked to consent to the search, not ordered, and patrons must be told they do not need to consent to the search and their ticket price may be refunded if they do not consent. *Id.* The record does not indicate any of these steps are part of REA's search policy.

[¶ 22] The State alleges, without citing legal authority, the pat-down search used on Seglen was "but an extension of the visual observations, justified by patrons' ability to conceal items in oversized clothing and the facility's heightened need to protect not only hockey game patrons, but the Minnesota and North Dakota Governors as well." Because a pat-down search is very intrusive, *see generally Jensen,* 317 N.W.2d at 624; *State v. Zearley,* 444 N.W.2d 353, 356 (N.D.1989), this argument, without pointing this Court to any legal authority, is not persuasive.

## IV.

[¶ 23] We reverse and remand to allow Seglen an opportunity to withdraw his guilty plea.

[¶ 24] MARY MUEHLEN MARING, J., concurs.

[¶ 25] The Honorable WILLIAM A. NEUMANN, a member of the Court when this case was heard, resigned effective March 14, 2005, and did not participate in this decision.

VANDE WALLE, Chief Justice, concurring specially.

[¶ 26] I concur in the result reached by the majority opinion. I write separately because I am concerned that Part II C of the majority opinion, in its terse disposition of the issue of consent to search, leaves an impression with which I do not agree, i.e., that the operators of a facility of this nature are helpless to prevent a violation of the rules of the facility. After citing cases to the effect that the State must show affirmative conduct by the person alleged to have consented to the search, cases with which I agree, and observing that signs were posted at the entries to REA warning persons they are subject to search, the majority concludes this issue with the statements that the existence of conspicuously posted signs does not establish Seglen's consent to search, there is no evidence of affirmative conduct by Seglen to consent to the search, that the State did not meet its burden of establishing Seglen's consent and that the consent exception to the warrant requirement is therefore not applicable.

[¶ 27] In the first instance it is not clear to me that the issue of consent was raised in the trial court or, if it was raised, if it was decided. In the trial court's memorandum decision denying the motion to suppress, the trial court stated:

It must also be noted that conspicuously posted prior to the REA entry points are written warnings that persons seeking entry into REA are subject to search. Defendant argues that despite the warnings of potential pre-entry searches, any fruits of such a search

cannot be used in a criminal prosecution, but rather should simply be used to deny access to the facility.

Following those statements, the trial court framed the issue: "Whether, under the facts and circumstances of this particular case, Officer Inocencio's stop of the Defendant was reasonable under the Fourth Amendment and the subsequent seizure of evidence permissible." In resolving that issue the trial court held the stop was reasonable because "There were security concerns; there were posted signs advising entrants of possible searches if they sought entry into REA; and the Defendant was not singled out, but rather the subject of a pat down because of the apparel he was wearing." It thus appears to me that the trial court concluded the signs were but one of the factors which made the stop "reasonable" rather than concluding the signs and Seglen's apparent lack of resistance to the pat down were a consent to search and an exception to the warrant requirement.

[¶ 28] More significantly, however, I believe the conspicuously posted signs may serve to warn persons such as Seglen that they may be required to consent to the search or be denied admission to the facility. Although persons seeking entrance may complain that such a Hobson's choice is no choice at all and is not the voluntary consent required under the exception-to-the-warrant requirement, I believe the facility, particularly a private facility, may impose such a requirement for legitimate purposes. No one has argued that the purposes which prompted the search were improper or invalid. Indeed, Seglen conceded as much at the trial court when he argued that despite the warnings of potential pre-entry searches, any fruits of the search could not be used to prosecute him but simply be used to deny him access to the facility. Thus, because of the nature

of the bulky clothing he was wearing, I believe Seglen could have been affirmatively given the choice of consenting to a search or being refused admission to the facility and, had he chosen to consent to the search, such consent would have been voluntary.

[¶ 29] However, I agree with the majority that on this record it is not clear Seglen was, in fact, given such a choice. The most that could be gleaned is that Seglen impliedly consented to the search by not protesting or by not leaving. But, as the majority observes, that is not sufficient. Absent evidence that Seglen was told he could consent to the search or he could leave, I agree with the conclusion reached by the majority. The signs do not give the officers the right to search. They could only serve as a warning that a person may be asked to submit to a search. If facilities are going to use this method to enforce their rules I suggest the sign should include a statement that would-be entrants dressed in bulky clothing may be asked for their permission to search or may leave without entering.

[¶ 30]   Gerald W. VandeWalle, C.J.

SANDSTROM, Justice, dissenting.

[¶ 31] Although I agree with much of what the Chief Justice has written in his separate opinion, I dissent because the majority reverses on a basis not raised to the district court by the defendant.

[¶ 32] In the district court, the defendant's issue was what could be done with evidence, not whether he consented to the search.

[¶ 33] At the suppression hearing, the defendant's lawyer argued that "the sign just says they may be subject to search. Again does not indicate specifically that this evidence could be used in a court of law against them." And, "So it's again a matter of what can we do with this evidence once it's seized. Can we use it in a court of law."

[¶ 34] After the State's argument, the court asked whether there was any response. The defense again argued, "Just, Your Honor, this is the type of thing that could be cured. I mean, I think if you did a properly noticed sign which spelled out clearly the consequences that the subject to search that it is subject to arrest or seizure for items prohibited by law."

[¶ 35] The defendant's argument in the district court was not that he did not consent to the search, but that he did not consent to the evidence being used in a court of law.

[¶ 36] The defendant's failure to dispute in the district court his consent to search precludes him from raising it here. *State v. Steffes*, 500 N.W.2d 608, 615 (N.D. 1993); *Gonzalez v. Tounjian*, 2003 ND 121, ¶ 31, 665 N.W.2d 705.

[¶ 37] I would affirm the district court judgment.

[¶ 38]   Dale V. Sandstrom